AO 91 (Rev. 08/09) Criminal Complaint

FILED
Clerk
District Court

JUN - 6 2011

For The Northern Mariana Islands
By________
(Deputy Clerk)

# UNITED STATES DISTRICT COURT

for the

District of the Northern Mariana Islands

United States of America
v.
Li HUA, a.k.a., "Lilly"

*Defendant(s)*

Case No. CR 11-00015

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 30, 2011 in the county of n/a in the n/a District of the N.M.I., the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| Counts One--Six:<br>8 U.S.C. § 1324(a)(1)(A)(iv) | On or about May 30, 2011, within the District of the Northern Mariana Islands and elsewhere, the defendant, Li HUA, did encourage and induce the six aliens named below (by count) to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that their coming to, entering, and residence in the United States was or would be in violation of law, to wit: by recruiting the aliens from China to the CNMI in order for them to unlawfully work and reside in the CNMI while paroled in as tourists. Counts One: Cuilan MA; Two: Chunping LI; Three: Lifei BIAN; Four: Shoujun YIN; Five: Zhongjun YU; and Six: Zhipeng REN |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Isra Harahap, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/6/11

[signature]
*Judge's signature*

City and state: Saipan, MP

David A. Wiseman, Designated U.S. Dist. Ct. Judge
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>LI HUA, a.k.a., "LILLY,"<br>Defendant. | Case Number:<br><br>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT** |

## INTRODUCTION

I, Isra D. Harahap, being duly sworn and under oath, depose and state:

1. I am a Special Agent (SA) with Homeland Security Investigations (HSI), in the Immigration and Customs Enforcement (ICE) agency under the United States Department of Homeland Security. I have been employed by ICE since March of 2004, and was permanently assigned to the HSI Office of the Resident Agent in Charge (RAC) in Saipan, Commonwealth of the Northern Mariana Islands (CNMI) in January of 2011. Prior to my employment with ICE, I was employed as a police officer at Iowa State University in Ames, Iowa, for almost ten years. Altogether, I have over fifteen years of law enforcement experience. As a police officer in the state of Iowa and as a federal agent, I have experience writing affidavits in support of arrests based on probable cause, and writing affidavits in support of arrest warrants and search warrants. I am also authorized to arrest individuals based on

probable cause, and to execute arrest warrants and search warrants.

2. I hold a Bachelor's degree in Aerospace Engineering from Iowa State University. I have also completed the ICE Special Agent training and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia.

3. As an HSI Special Agent, I am responsible for investigating and enforcing violations of the customs and immigration laws of the United States, including Titles 8, 18, 19, 21, and 42 of the United States Code, along with the Immigration and Nationality Act (INA) and related statutes. My duties include investigating and enforcing violations of Title 18, United States Code, Section 1324.

4. All of the statements and information contained in this affidavit are based upon my review of investigative reports prepared by myself and other law enforcement officers with the knowledge of the facts recited; upon my conversations with law enforcement officers having personal knowledge of the pertinent facts; and upon my review of official documents and records maintained by local and federal agencies. Based therein, all of the statements and information contained in this affidavit are true and correct to the best of my knowledge, information, and belief. Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I have learned during the course of my investigation. Unless otherwise indicated, all actions, statements, and conversations that I have recounted in this affidavit are related in substance and in part.

5. I make this affidavit pursuant to Rules 4(a) and 5(b) of the Federal Rules of Criminal Procedure to support the arrest of LI HUA, that is, to establish probable cause that Li HUA committed a violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

**BACKGROUND INFORMATION ON THE CNMI'S PAROLE SYSTEM**

6. At all times relevant to the information in this affidavit, and specifically since November 28, 2009, Chinese nationals may be granted permission to enter the CNMI under a parole program.

Under the program, Chinese nationals may be paroled into the CNMI for business or pleasure for a temporary period of time. To be granted parole, an arriving Chinese citizen must a) be a national of the People's Republic of China; b) be solely entering and staying in the CNMI for a period not to exceed forty-five days; c) be in possession of a round trip ticket that is nonrefundable and nontransferable and bears a confirmed departure date not exceeding forty-five days from the date of entry into the CNMI; d) be in possession of a completed and signed Guam-CNMI Visa Waiver Information form (CBP Form I-736); e) be in possession of a completed I-94, Arrival-Departure Record (CBP Form I-94); and f) be in possession of a valid unexpired ICAO-compliant, machine readable passport. Chinese visitors who are paroled under the program may not engage in local employment or labor for hire, and may not overstay the length of their parole.

## SUMMARY OF INVESTIGATION

7. In May of 2011 as described herein, Honglian Cheng and LI HUA (HUA) helped four Chinese females—Cuilan Ma, Chunping Li, Lifei Bian, and Shoujun Yin—and two Chinese males—Zhongjun Yu and Zhipeng Ren—come to, enter, and reside in the CNMI as tourists under the parole program, knowing that the Chinese nationals came to the CNMI in order to find long-term employment, and helping the Chinese nationals find employment and residence in the CNMI that would be in violation of their parole status.

## PROBABLE CAUSE

8. On May 27, 2011, a Cooperating Source (CS) informed HSI Special Agent Paul Akeo, Jr. and me that the CS had been communicating with a Chinese national named Honglian Cheng (Cheng) on "QQ," a free instant messaging service based in the People's Republic of China, in order to bring in several Chinese nationals to work in the CNMI. QQ allows individuals to communicate with each other through instant messaging, audio, and video over the internet. I obtained a copy of the CS's QQ

conversations with Cheng from May 12, 2011, to May 27, 2011. The conversations were in Mandarin, and I had the conversations translated. At the time of the writing of this affidavit, I had received most of the translations from the QQ conversations from May 12, 2011, to May 21, 2011. According to these translations from the QQ conversations between the CS and Cheng, I learned:

a. Cheng planned to bring several Chinese nationals to the CNMI as tourists to work in the CNMI, and wanted the CS's help once they arrived in Saipan.

b. Cheng agreed to pay the CS $1,000 USD for booking a hotel room in Saipan and renting a vehicle to transport Cheng and the Chinese nationals from the airport to the hotel.

c. On or about May 24, 2011, Cheng emailed scanned images of the Chinese passports for HUA, Cuilan Ma (Ma), Chunping Li (Li), Lifei Bian (Bian), Shoujun Yin (Yin), Zhongjun Yu (Yu), Zhipeng Ren (Ren), and Wendong Wang (Wang), and told the CS that Cheng is bringing these eight people to the CNMI in order for them to work.

d. Cheng made plans with the CS for the females to work in a bar and for the males to work on a farm.

9. I also debriefed the CS on the CS's QQ conversations with Cheng. During my debriefings with the CS, I learned that the CS reserved five rooms for three days at a hotel in Saipan and paid $325 USD for the first night. Cheng wired approximately 2,100 RMB to a bank account in China to pay the CS for the hotel rental. Cheng also sent the CS a digital copy of Cheng's flight itinerary, which indicated that Cheng was going to arrive in Saipan on Asiana Airlines flight no. 605. The CS also provided me with a photograph of Cheng that the CS was able to take of Cheng over the internet during their communications through the QQ service. The CS informed me that the CS made plans to pick up Cheng and the others at the Saipan airport when they arrived on May 30, 2011.

10. I verified through immigration records that Cheng, HUA, Ma, Li, Bian, Yin, Yu, Ren, and Wang were scheduled to travel to Saipan on Asiana Airlines flight no. 605, arriving in the early

morning hours on May 30, 2011.

11. In the early morning on May 30, 2011, and in anticipation of their arrival in Saipan, I conducted surveillance at the Saipan International Airport. I witnessed the arrival and immigration inspections of eight of the individuals named above—Cheng, HUA, four other females (Ma, Li, Bian, and Yin (the "four Chinese females")), and two males (Yu and Ren (the "two Chinese males")). Wang was the only person identified earlier that did not arrive in Saipan. During their immigration inspection at the airport, HUA, the four Chinese females, and the two Chinese males stated that they planned to stay in Saipan for seven days as tourists. HUA specifically informed the immigration officer and myself that she was not going to work or seek employment in the CNMI, and that she understood that parolees could not work in the CNMI. Cheng identified herself as the tour group leader for the other seven individuals. The immigration officers at the airport allowed all eight individuals to be paroled into the CNMI until June 15, 2011. After passing through immigration inspection, the CS picked them up and took them to their hotel. I debriefed with the CS later that morning and learned that the CS was paid $1,000 USD cash from Cheng for picking them up at the airport and taking them to the hotel. The CS also informed me that the CS had learned that Cheng and HUA were the "snakeheads" (a word commonly used by Chinese nationals to indicate smugglers), and that Cheng and HUA had collected money from the four Chinese females after they arrived at the hotel.

12. In the afternoon on May 30, 2011, I continued my surveillance of the eight individuals with the help of the CS, an interpreter, and other HSI special agents. The CS continued to act as a transporter for the individuals, and helped them travel from the hotel to a karaoke bar in order to find work for the females. The CS also, at times, was able to speak solely with Cheng. During my later debriefings with the CS, the CS informed me that during the CS's conversations with Cheng, the CS learned that Cheng and one of the other ladies, later identified as HUA, received money for bringing the other six individuals to the CNMI. The CS also informed me that the two Chinese males (Yu and Ren)

had deposited money into HUA's bank account in China to pay for their fee to come work in Saipan.

13. On May 31, 2011, I continued my surveillance of the eight individuals with the help of the CS, an interpreter, and other HSI special agents. In the afternoon, I witnessed the CS take HUA and the four Chinese females around Saipan to look for an apartment to rent. The CS took them to three different places. In a debriefing later with the CS, I learned that HUA did most of the talking to the landlords when they inspected the apartments, and that HUA ultimately made a $50 USD deposit on an apartment to rent on a month-to-month basis. The CS also informed me that the CS provided "job application" forms to Cheng, and that Cheng gave the forms to HUA and the four Chinese females. These forms were created by HSI to use during the investigation to confirm that the individuals were seeking employment in the CNMI. The CS informed me that the CS witnessed HUA help the four Chinese females fill out the job application forms, and that the CS collected the forms from them afterwards. The CS gave me the filled out forms. The CS also informed me that the CS spoke to HUA alone, and that the CS specifically informed HUA that working on a tourist status is illegal. HUA first indicated that she did not know that working on a tourist status was illegal, but HUA later indicated in the same conversation with the CS that she knew overstaying in the United States as a tourist was illegal. Later in this conversation, HUA also made plans with the CS to bring other Chinese nationals to the CNMI as tourists in the future so that they could work in the CNMI.

14. On June 1, 2011, I continued my surveillance of the eight individuals with the help of the CS, an interpreter, and other HSI special agents. I witnessed Cheng and the CS help the two Chinese males move from their hotel into a barracks in a different location. I also witnessed HUA and the four Chinese females move from the hotel to the apartment they had made the down payment on the day before. Other agents witnessed the CS speak to HUA alone in a car outside the apartment. The meeting between the CS and HUA was recorded, and a translation of that conversation revealed that the four Chinese females and the two Chinese males paid approximately 30,000 RMB or $4,600 USD to be

brought into the CNMI in order to work. The translation also revealed that HUA informed the CS that HUA was working with Cheng to bring these six Chinese nationals to the CNMI to work, and that Cheng was the primary organizer in the CNMI while HUA was the primary organizer in China.

15. On June 2, 2011, I continued my surveillance of the eight individuals with the help of the CS, an interpreter, and other HSI special agents. On this day, the CS spoke to HUA on the phone, and in a debriefing with the CS later that day, I learned that HUA had informed the CS that HUA may be leaving Saipan on June 4 or 5, 2011. The CS also informed me that Cheng planned to leave Saipan on June 3, 2011.

16. On June 3, 2011, I continued my surveillance of the eight individuals with the help of the CS, an interpreter, and other HSI special agents. I witnessed the CS transport Cheng to the Saipan International Airport at approximately 12:45 a.m. I arrested Cheng at the airport as she was trying to leave Saipan for China. Cheng informed me, in a Mirandized post-arrest statement, that she worked with HUA to bring the six Chinese nationals (Ma, Li, Bian, Yin, Yu, and Ren) to the CNMI in order to work. Cheng acknowledged that they both received money for their part in bringing these individuals to the CNMI, and that Cheng was responsible for bringing them to Saipan, and that HUA was responsible for recruiting them in China.

17. In the evening on June 3, 2011, the CS met with HUA at the beach. The meeting was recorded and translated. During the meeting, the CS asked HUA how HUA and Cheng met. HUA stated that she met Cheng through recruiting people to go overseas and that they have worked together to recruit people to go overseas. HUA also confirmed that she planned to leave Saipan in the early morning on June 5, 2011, and that the CS would give her a ride to the airport.

18. On June 5, 2011, the CS transported HUA to the Saipan International Airport at approximately 12:45 a.m. I arrested HUA at the airport as she was trying to leave Saipan for China.

19. During this investigation, the CS wore a device which would record video and audio of

the CS's activities with the eight individuals, and which would also transmit the audio to a receiver to allow me to listen to the real-time conversations through an interpreter. The recordings have not yet been fully translated, but the real-time interpretations of the communications and the incomplete translations of the recordings confirm the activities that I have reported in this affidavit.

**CONCLUSION**

20. I have shown this affidavit and the accompanying complaint to Assistant United States Attorney Kirk Schuler, and he informs me that the complaint and affidavit are in proper form.

21. Based on the foregoing, I believe there is probable cause that Li HUA committed the violations of 8 U.S.C. § 1324(a)(1)(A)(iv) as charged in the criminal complaint.

Dated: June 06, 2011

By: ______________________
Isra D. Harahap
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on June ___, 2011.

______________________
David A. Wiseman
Designated United States District Court Judge
District of the Northern Mariana Islands